IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RANDY ANDERSEN, SR., | ) | |
| | ) | |
| Plaintiff, | ) | 8:06CV305 |
| | ) | |
| v. | ) | |
| | ) | |
| K. KONPCHI, C405, DETENTION SUPERVISOR; OFFICER GUSTAFSON, E.#1394; OMAHA POLICE DEPARTMENT; THOMAS WARREN, CHIEF OF POLICE | ) ) ) ) ) | MEMORANDUM OPINION |
| | ) | |
| Defendants. | ) | |

This matter is brought before the Court by motions for summary judgment pursuant to Fed. R. Civ. P. 56 filed by both plaintiff Randy Andersen, Sr. ("Andersen")(Filing No. 23) and defendants K. Konpchi ("Kryzcki"[1]), E. Gustafson #1394 ("Gustafson"), Omaha Police Department("OPD"), and Chief of Police Thomas Warren ("Warren")(collectively referred to as "defendants")(Filing No. 27). Andersen filed his complaint pursuant to 28 U.S.C. § 1983 and identifies the defendants in their official capacities only (Filing No. 1). Andersen failed to timely amend his complaint to include the defendants in their individual capacities, but has repeatedly attempted to do so since the Court's deadline passed (Filing Nos. 14, 30).

---

[1] Apparently, OPD detention unit supervisor Karla Kryzcki was incorrectly named in the complaint as K. Konpchi. The Court will refer to this defendant as Kryzcki.

Andersen's complaint claims that by not transporting him to the hospital in response to his complaints of spitting up blood, producing bloody stools, pain, and dizziness, Kryzcki, Gustafson, the OPD, and Warren violated his Eighth Amendment right to be free from cruel and unusual punishment.

### I. Background

Randy Andersen, Sr. ("Andersen") was involved in a motor vehicle collision on November 26, 2005. Andersen was admitted to Creighton University Medical Center, St. Joseph Hospital ("CUMC") on the same day. During his hospital stay, Andersen was treated for wounds suffered as a result of the motor vehicle collision. Andersen left the hospital against medical advice on December 7, 2005. Two days later, Andersen was apprehended by Omaha Police officers and taken to the Omaha Police Department's detention unit ("OPD detention unit") because he was wanted for felony manslaughter in connection with the November 26, 2005, motor vehicle collision.

Andersen was taken into custody at the OPD detention unit at 11:08 p.m. on December 9, 2005 (Aff. Kryzcki ¶ 2). At around 5:30 p.m. on December 10, 2005, a OPD detention unit employee noticed that Andersen had a superficial wound on his abdomen, 2-3 centimeters in length. This employee notified the OPD detention unit supervisor, Kryzcki, of the visible wound on Andersen's abdomen (Aff. Kryzcki ¶ 3).

-2-

Kryzcki went to Andersen's cell and inquired about the wound, to which Andersen informed her that he had been in a car accident, had been treated at a hospital and that after leaving the hospital, the staples keeping the wound together had come loose. Kryzcki asked if anyone had treated or examined it since the staples had come loose; Andersen replied affirmatively and that a doctor told him that nothing more could be done to treat the wound (Aff. Andersen, Pg. 2). Andersen did not complain about the superficial wound, but claims that he complained about pain, dizziness, and internal injuries causing him to cough up blood and produce bloody stools (Aff. Andersen, Pg. 3). At this time Andersen requested, and was allowed, to use the phone to call his wife (Aff. Andersen, Pg. 2). Kryzcki then sent another OPD detention unit employee to the fire station to get hydrogen peroxide and gauze to bandage the wound (Aff. Kryzcki ¶ 4). Kryzcki and Andersen used these materials to treat the superficial wound (Aff. Andersen, Pg. 3).

Later, Andersen's wife called the OPD detention unit and asked Kryzcki to call an ambulance to take Andersen to the hospital (Aff. Kryzcki ¶ 6). Kryzcki then spoke to Andersen who said that his wife told him that he should go to the hospital. Id. Kryzcki then called the police unit that included the officers who arrested Andersen in order to better assess the situation (Id, at ¶ 7). The officer she spoke to, defendant Eric

Gustafson #1394 ("Gustafson") told Kryzcki that Andersen was not expected to leave the hospital until after December 25, 2005, but left on December 7, 2005, and eluded police for two days (Id; Defendants Exhibit ("Ex.") 2B). Gustafson told Kryzcki that because of this, Andersen was considered a flight risk (Aff. Kryzcki ¶ 7; Ex. 2B).

After receiving this information, Kryzcki informed Andersen that he would not be going to the hospital (Aff. Kryzcki ¶ 8). She subsequently completed a PO9 Form used by the OPD detention unit to document instances when a detainee requests medical assistance and is denied (Ex. 2B). In this form, Kryzcki identified the nature of the illness as staples that had been pulled out of Andersen's abdomen (Ex. 2B). In addition, Kryzcki stated that the reason for denying hospital transport was that Gustafson had told her that Andersen was a flight risk and that he had been given bandages, disinfectant, and aspirin for his wound (Ex. 2B). Video footage corroborates this treatment of Andersen's wound (Ex. 6). In addition to the PO9 Form, Kryzcki described the incident in the detention supervisor's special alert and incident log for December 10, 2005 (Ex. 2A). She had no further contact with Andersen (Aff. Kryzcki ¶ 11).

On December 12, 2005, the OPD detention unit manager, Charles Benak ("Benak"), read the supervisor log and noted the incident (Aff. Benak ¶ 3). While making a walk through the cell

area, Benak told Andersen that he was the unit manager and asked how Andersen was doing (Aff. Benak ¶ 4). Andersen replied that he was "fine," and did not ask for any medical attention (Aff. Benak ¶ 4). Andersen does not recall this incident (Aff. Andersen, Pg. 4).

At around noon on December 12, 2005, Andersen was transferred to the Douglas County Correctional Center ("DCCC") where, upon arriving, he underwent an intake "medical history and screening assessment" (Aff. Ott ¶ 9; Ex. 8A). Two days later, on December 14th, Andersen underwent a physical assessment (Ex. 8B). Neither of these documents record anything about Andersen suffering from symptoms of bloody vomit or bloody stools, pain or dizziness (Ex. 8A, 8B). On December 18th in his cell at DCCC, Andersen vomited a substantial amount of blood and DCCC personnel called for an ambulance, which transported Andersen to CUMC where he had emergency surgery and a significant blood transfusion (Filing No. 5, Pg. 8, 28, 29). Andersen informed the medics that took him to CUMC and medical personnel at CUMC that he first suffered from symptoms of nausea, bloody vomit, and dark, tarry stools on the morning of December 18, 2005 (Filing No. 34, Pg. 13, 22).

Four months later Andersen filed a grievance with the Omaha Police Department ("OPD"), claiming that he was wrongfully denied hospital transport by Kryzcki and Gustafson (Aff. Ott

-5-

¶ 2). The Internal Affairs Unit for the OPD is headed by Sergeant Charles Ott ("Ott") who investigated Andersen's grievance (Aff. Ott ¶ 1). During his investigation, Ott interviewed Andersen and four staff members involved with Andersen's confinement at OPD, obtained and reviewed medical records concerning Andersen, and viewed the entire length of the video recording of Andersen's confinement in his cell at the OPD detention unit (Aff. Ott ¶ 7; Filing No. 23, Pg. 24-28).

Andersen claims, and Kryzcki denies, that Andersen made repeated complaints to Kryzcki of suffering from pain and dizziness, bloody stools and bloody vomit associated with serious internal injuries (Complaint ¶ 5). Andersen claims that these symptoms were clear evidence that he was suffering from serious internal bleeding (Complaint ¶ 5). He claims that the staff at the OPD detention unit knew of these symptoms and instead of calling for hospital transport, Kryzcki treated the superficial wound, and thereafter repeatedly told him to shut up and lie down (Complaint ¶ 5).

Andersen filed a complaint claiming that the defendants denied him medical care from December 10, 2005, through December 13, 2005, in violation of his Eighth Amendment right to be free from cruel and unusual punishment (Filing No. 1). Andersen filed a motion for summary judgment and the defendants then responded by filing a motion for summary judgment (Filing Nos. 23 and 27).

-6-

Both sides have submitted material in support of their motions and the defendants have submitted a brief in support of their motion.

## Standard of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment must always bear "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* NELR 56.1(a).  When the party seeking summary judgment carries its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996); *see* NELR 56.1(b).

At the summary judgment stage, the evidence is viewed in a light most favorable to the nonmoving party, with all inferences drawn in that party's favor. *See Matsushita Elec. Indus.*, 475 U.S. at 587. In making this review, the Court does not "weigh the evidence and determine the truth of the matter" but instead determines "whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus.*, 475 U.S. at 587.

### Andersen's claims against defendants in their official capacities.

Suing a public employee in their official capacity is tantamount to suing the public employer. *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006). In this case, Kryzcki, Gustafson, and Warren are employed by the Omaha Police Department (the other named defendant), which is operated by the City of Omaha, Nebraska. Therefore, all of Andersen's claims against the defendants in their official capacities are all claims against the City of Omaha. Under 28 U.S.C. § 1983, the City of Omaha can be held liable when an employee of the City deprives another person of their constitutional rights as a result of conduct pursuant to an official policy or custom. *Williams v. Davis*, 200 F.3d 538, 539 (8th Cir. 2000)(citing *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997)). Informal customs or policies that

-8-

are "so widespread as to have the force of law," can also impose such liability. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998).

The United States Supreme Court has recognized that the Eighth Amendment right to be free from cruel and unusual punishment includes an inmate's right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). In order to successfully claim that the City's official policy or widespread custom was unconstitutional, the plaintiff must show that the policy recklessly disregarded his right to medical care. *Butler v. Fletcher*, 465F.3d 340, 345 (8th Cir. 2006).

A prison official deprives a prisoner of the Eighth Amendment right to medical care if the official's conduct amounts to "deliberate indifference to [a prisoner's] serious medical needs." *Estelle*, 429 U.S. at 104. As a pre-trial detainee, the Eighth Amendment does not apply to Andersen, but the Eighth Circuit Court of Appeals has held that the same 'deliberate indifference' test applies equally to pre-trial detainees through the Fourteenth Amendment's due process clause. *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006) (See also *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). In order to have a claim based on deliberate indifference Andersen must show that: (1) he had an objectively serious medical need; and (2) that defendants subjectively knew of the need and deliberately

disregarded it.  *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)(citations omitted).

     Viewed in a light most favorable to Andersen, no rational trier of fact could find that there was a policy or widespread custom of the City of Omaha in place at the OPD detention unit that caused Andersen to be deprived of his constitutional right to receive medical care.  There is documentary evidence that the policies and procedures of the OPD detention unit were designed and implemented to adequately preserve a detainee's right to medical care.  Kryzcki filled out a "PO9 form" detailing her denial of a medical request and the reasons for doing so (Ex. 2B).  In addition, she also noted the incident in the supervisor log, which was designed to inform and alert the incoming shift employees of any situations to which they should pay special attention (Ex. 2; Aff. Benak ¶ 3,4).  By requiring such documentation, the OPD detention unit's policy towards a detainee's requests for medical attention emphasized the detainee's right to medical care, and required OPD detention unit employees to give attention to, not recklessly disregard, detainee's requests for medical care.

     The OPD also had a policy of actively responding to detainees' requests for medical attention.  If there was an obvious need for medical attention, a rescue squad was to be called (Aff. Benak ¶ 6).  If there was doubt of whether the

request was made in good faith or rather merely a ploy to get out of the cell, the supervisor was to investigate the request and determine if the request is legitimate. *Id*. In the case of complaints or requests based on specific symptoms such as Andersen alleges to have made, the person is to show the staff member the actual evidence of the complaints and only then will a rescue squad be called (Aff. Benak ¶ 7; Aff. Kryzcki ¶ 9). The policies and procedures at the OPD detention unit are adequately designed to protect detainees from being deprived of their Eighth Amendment right to medical care and do not recklessly disregard any detainee's right to receive medical care.

Furthermore, if OPD employees do not follow the policies and procedures, they are subject to investigations conducted by the Internal Affairs Unit and the employees are subject to disciplinary actions up to, and including termination (Aff. Benak ¶ 9). The defendants have produced evidence that the Internal Affairs officer conducting the investigation reviewed sixty hours of video footage of the cell where Andersen was confined, in order to determine whether Andersen's grievance was substantiated (Aff. Ott ¶ 6). This evidence shows that the OPD and the City of Omaha expends considerable assets ensuring that employees will abide by the policies put into place in order to protect detainees' constitutional rights.

**Anderson's failed attempts to amend his complaint to include the defendants in their individual capacities.**

Even if the Court allowed Andersen to amend his complaint in order to include the defendants in their individual capacities, his motion for summary judgment would be denied and the defendants' motion for summary judgment would be granted. Viewed in a light most favorable to Andersen, the record fails to show that Andersen had an objectively serious medical need during his confinement at the OPD detention unit. In order for a medical need to be objectively serious, it must be either "obvious to a layperson or supported by medical evidence, like a physician's diagnosis." *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)(citing *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995)).

In this case, Andersen alleges that he complained of spitting up blood and having blood in his stools, but he does not allege that evidence of these symptoms were ever shown to Kryzcki or other staff at the OPD detention unit. Thus, the only medical need that was obvious to a layperson was the 2-3 cm superficial wound on Andersen's stomach, for which he received treatment. In addition, three hours after Andersen was transferred from the OPD detention unit to the DCCC, a medical history and screening assessment was performed on Andersen, and he did not complain of any symptoms of internal injuries (Ex. 8A). Nor did Andersen

-12-

complain of any of these symptoms two days later during a physical assessment (Ex. 8B).  Andersen did not suffer a serious medical need requiring hospital transport until December 18th 2005, when he was promptly transferred to CU C for treatment.  This was eight days after he was transferred from the custody of the City of Omaha and was, according to the medical records attached to his motion for summary judgment (Filing No. 34, pp. 13 and 22) the first time this occurred.  These facts, viewed in a light most favorable to Andersen show that he did not suffer from an objectively serious medical need that required a hospital transport until several days after leaving the OPD detention unit.  Therefore, OPD detention unit staff did not deprive Andersen of his constitutional right to medical care, and any complaint against Kryzcki, Gustafson, and Warren in their individual capacities would fail.  A separate order will be entered herein in accordance with this memorandum opinion.

DATED this 9th day of July, 2007.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court